RALPH E. WILSON AND MARY ANN WILSON, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 91229.   Filed June 19, 1963.

*Ralph E. Wilson,* pro se.
*Robert L. Ackerson,* for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax in the amount of $2,278.07 and additions to tax on account of fraud

---

in the amount of $1,139.03 for the taxable year 1958. At the trial the respondent conceded that no additions should be made on account of fraud. Other concessions having been made by both parties the issues remaining for decision are (1) whether petitioner received additional income as attorney fees and (2) whether petitioner sustained a deductible business bad debt loss.

FINDINGS OF FACT

Some of the facts have been stipulated and are incorporated herein by this reference.

The petitioners are husband and wife residing in Osceola, Ark. They filed a joint Federal income tax return for the taxable year 1958 on the cash receipts and disbursements method with the district director of internal revenue at Little Rock, Ark. Ralph E. Wilson will hereinafter be referred to as the petitioner.

The petitioner is an attorney licensed to practice in the States of Arkansas and Tennessee. As a part of his practice he engaged in the preparation of Federal income tax returns for taxpayers.

On October 18, 1957, the petitioner and his brother, Denver Wilson, purchased a controlling interest in the Liberal State Bank, Liberal, Mo., sometimes hereinafter referred to as the bank, each purchasing 29 percent of the outstanding capital stock. Petitioner became the vice president of the bank and his brother became the president. On July 1, 1958, the petitioner acquired the interest theretofore owned by his brother and became president of the bank. During 1958 the petitioner received salary from the bank totaling $5,130.

The returns which the petitioner, in his law practice, prepared for taxpayers during the year 1958, which numbered not less than 730, were returns of taxpayers who were small wage earners who desired to obtain loans based upon their potential tax refunds. During that year about 2,000 taxpayers had applied to the petitioner seeking his assistance in preparing their returns. The petitioner, however, in order to minimize as nearly as possible the chance of audits by the Internal Revenue Service, prepared returns for only those individuals who claimed no dependents other than their immediate families, who claimed no itemized deductions, and all of whose income had been subject to the withholding tax. Loans were made, in the manner described hereinafter, to the taxpayers whose returns were prepared by the petitioner.

A taxpayer would furnish the petitioner all necessary data for the preparation of his return, including withholding tax statements (Forms W-2), and the petitioner would prepare the return. The returns prepared disclosed refunds in relatively small amounts, ranging from about $20 to about $150. In a stipulated example, total wages of the taxpayer was $3,000. Tax withheld by the taxpayer's

employer was $300. The tax liability as computed or determined by the petitioner was $150. The difference of $150 was treated as a potential refund.

The petitioner would then have the taxpayer make a demand promissory note payable to the order of Liberal State Bank for $150, bearing interest at 8 percent per annum. The bank took the notes only upon the guarantee thereof by the petitioner, made orally in discussion with the officers of the bank. The taxpayer would also sign a power of attorney designating the Liberal State Bank as attorney-in-fact to cash his refund check when it arrived and to use the proceeds to pay the note. The petitioner would deduct from the $150 the following:

```
Fee for preparing return_____ $15. 00
Discount _____ ¹ 10. 00
Charge for life insurance_____   3. 50
                                                        _____
    Total deducted_____      28. 50
```

He would then make payment of the remainder of $121.50 to the taxpayer either by issuing his personal check or by paying cash.

The petitioner would send in daily to the bank all notes, and the bank, after deducting the discount of $10 and the insurance charge of $3.50, would deposit the balance of $136.50 in the petitioner's bank account. Thus, in the example, the petitioner would have paid out $121.50 to the taxpayer and there would have been credited to his account the amount of $136.50 ($121.50, plus $15 legal fee). The total amount so deposited in the petitioner's bank account in 1958 on account of such legal fees was $8,162.75. There were no restrictions whatever upon the petitioner's right to use this account, and he did in fact use it.

The $10 "discount" was retained by the bank as its income and was credited to its "Discount Account." The charge for life insurance was to give protection to the bank as well as to provide a source of income to it.

The individual income tax returns prepared by the petitioner for the various taxpayers were filed with the district directors of internal revenue at Little Rock, Ark., Kansas City, Mo., St. Louis, Mo., and Nashville, Tenn. Most of the taxpayers lived in Tennessee and Arkansas.

All of the returns which were filed with the district director of internal revenue at Nashville, Tenn., contained the same address in Memphis. All those filed with the district director at either St.

---

¹ It was stipulated that the notes bore interest at 8 percent per annum. However, there is no evidence that the taxpayers ever paid any interest other than the "discount." The bank expected payment to be made, by receipt of the refund checks, within 60 or 90 days. The $10 item for "discount" equals 8 percent of $125 ($121.50 advanced to the taxpayer and $3.50 life insurance charge).

Louis or Kansas City, Mo., contained the same address at Liberal, Mo. The use of these addresses in the taxpayers' returns was to assure the bank's receiving the refund checks.

The refund checks which were delivered at the two addresses were endorsed by the bank as attorney-in-fact under the powers of attorney and the proceeds were used to pay off the promissory notes executed in favor of the bank by the particular taxpayers concerned.

Sometime in March 1958 the Internal Revenue Service requested the U.S. Post Office Department to discontinue the delivery of Federal income tax refund checks to the Memphis address. Consequently, some of the checks addressed to that address were not delivered. Subsequently, arrangements were made with the Internal Revenue Service for the reissuance of some of such checks and delivery thereof to another attorney after the taxpayers concerned had executed new powers of attorney in favor of such other attorney. Under that arrangement no less than 100 such refund checks were reissued and mailed to the new attorney, and the bank received the proceeds therefrom. However, in some instances the Internal Revenue Service did not reissue the refund checks. Of the notes given by taxpayers to the bank in 1958, notes of a total face amount of about $22,000 were never paid. In January 1959 the petitioner borrowed $10,000 and paid that amount to the bank on account of these unpaid notes. The petitioner has never collected on these notes.

Of the amount of $8,162.75 deposited by the bank in petitioner's bank account in 1958 as legal fees for services rendered by the petitioner in preparing returns, $3,691.57 were fees paid by taxpayers whose notes were never paid to the bank and $4,471.18 were fees paid by taxpayers whose notes were paid.

In his income tax return for the taxable year 1958 the petitioner reported net income of $216.48 from his law practice. There were not included in his return any fees for the preparation of income tax returns paid by the taxpayers under the above-described procedure.

In the notice of deficiency the respondent determined that the petitioner was taxable upon the full amount of $8,162.75 as legal fees received in the taxable year 1958.

In October 1958 the petitioner, in his capacity of president of the Liberal State Bank, carried on negotiations in New York City with a brokerage firm located there with regard to the request of such firm for a loan of $15,000 from the bank. The discussions were carried on in the office of a large New York bank, and the petitioner agreed to make the loan, the brokerage firm agreeing to pledge certain stock as collateral. The petitioner then went to the office of the brokerage firm and while there received a call from a representative of the New York bank advising him not to make the loan because the brokerage firm was in poor financial condition. The petitioner had already

issued a check on behalf of Liberal State Bank in favor of the broker-age firm in the amount of $15,000 and had taken the brokerage firm's note. However, as a result of the telephone call, he told the brokerage firm that it would not be advisable for him to make the loan. There-upon, the brokerage firm gave petitioner its own check dated October 21, 1958, payable to Liberal State Bank, in the amount of $15,001.50. Of the amount of such check $1.50 represented certain charges.

The petitioner returned to Liberal, Mo., taking the brokerage firm's check with him. Such check was entered for collection on October 24, 1958. A few days later the office of the attorney general of the State of New York commenced a proceeding against the brokerage firm and placed it in receivership. The brokerage firm had liabilities of about $500,000 and assets insufficient to pay administration expenses. The check of the brokerage firm in the amount of $15,001.50 was returned on November 14, 1958, to the Liberal State Bank unpaid on account of insufficient funds. No amount was ever received from the receivers of the brokerage firm on account of this worthless check.

When the check was returned to the bank unpaid the petitioner advised the cashier of the bank that he would make good the bank's loss if he could borrow sufficient funds. Shortly thereafter he did in fact borrow $7,500 from each of two other banks, and paid to the Liberal State Bank the amount of the check, $15,001.50.

In his income tax return for the taxable year 1958 the petitioner did not claim as a deduction any portion of the amount of $15,001.50 which he had paid to the bank as above described. By amended peti-tion filed at the time of the hearing of the instant case, the petitioner made claim for the deduction of $15,001.50 as a business bad debt loss.

### OPINION

The petitioner takes the position that when he, in the course of his law practice, prepared the Federal income tax returns for the numer-ous taxpayers he received notes which in part represented his fee for preparing the returns, that such notes had no fair market value, and that consequently he was not in receipt of taxable income until the notes were actually paid. He points out that notes of a face value, of about $22,000 were never paid and argues that fees to the extent of $3,691.57 represented by those unpaid notes did not constitute taxable income to him. He concedes that fees in the amount of $4,471.18, represented by notes which were paid, constituted taxable income to him in the taxable year 1958.

At the outset it must be pointed out that the petitioner reasons from an erroneous factual premise. Actually the petitioner did not re-ceive notes in payment of his fees, and we are therefore not con-cerned with the fair market value of the notes received by the bank.

As shown by the findings of fact, each of the taxpayers for whom the petitioner prepared returns executed a note payable to the Liberal State Bank in the full amount of the potential refund shown on the return. In substance, in each transaction the bank made a loan to the particular taxpayer in the amount of the potential refund, the bank retaining, however, its charge denominated "discount," a charge for life insurance on the debtor, and the petitioner's legal fee charged for preparing the return. It is true that the petitioner apparently in each instance first advanced the money to the taxpayer, but in this he quite evidently was acting on behalf of the bank. In each instance the bank deposited in the petitioner's bank account the full amount which the petitioner had advanced to the particular taxpayer, and in addition deposited the amount of the petitioner's legal fee. Thus, in effect, the various taxpayers for whom the petitioner prepared returns borrowed money and paid the petitioner's legal fees in cash. The fees which were placed in the petitioner's bank account were subject to the petitioner's unfettered use and command, and in fact he did use such account. Under these circumstances, we think there can be no question that the full amount of $8,162.75 so deposited in his account in 1958, representing his legal fees, constituted taxable income to him in that year. Income that is subject to one's unfettered command and that he is free to enjoy at his option is taxable to him. *Corliss* v. *Bowers*, 281 U.S. 376.

The petitioner contends, however, that since he had guaranteed the notes, he should not be taxed until the notes were actually paid, since there was always the possibility that he might have to make good any notes which were not paid. He points out that in fact in the year following the taxable year he made payments to the bank to the extent of $10,000 on the notes of a face value of about $22,000 which were not paid. However, the fact that he may have guaranteed the notes or even the fact that later he may have been required to make restitution to the bank, does not render the payments received in the taxable year as fees nontaxable to him in the year of receipt. *United States* v. *Lewis*, 341 U.S. 590, and *North American Oil* v. *Burnet*, 286 U.S. 417. In *North American Oil* v. *Burnet, supra*, it was stated:

If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. * * *

It is our conclusion that the respondent properly increased the petitioner's reported taxable income for the taxable year 1958 by the amount of $8,162.75, representing legal fees for that year. The question whether the petitioner would be entitled to a deduction for the taxable year 1959 on account of the payments made to the bank pursuant to his guarantee is not before us.

The petitioner contends that he is entitled to deduct for the taxable year 1958, as a business bad debt under section 166 of the Internal Revenue Code of 1954, and the regulations thereunder,[2] the amount of $15,001.50 which he paid in that year to the Liberal State Bank. This amount was not claimed as a deduction by the petitioner in his income tax return for 1958, but claim therefor was made by way of an amended petition filed at the hearing. The respondent contends that the petitioner is not entitled to the deduction.

The petitioner was the president, and owner of 58 percent of the stock, of Liberal State Bank. He carried on negotiations for the making of a loan on behalf of the bank to a New York brokerage firm, and had gone so far as to issue the bank's check in favor of the brokerage firm and receive a note from such firm when, upon learning that the brokerage firm was in poor financial condition, he decided not to make the loan. Thereupon the brokerage firm gave him its check, payable to Liberal State Bank, in lieu of returning the bank's check, and the loan was not consummated.[3] Thereafter the brokerage

---

[2] Section 166 provides:

  (a) GENERAL RULE.—

    (1) WHOLLY WORTHLESS DEBTS.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

       *       *       *       *       *       *       *

  (d) NONBUSINESS DEBTS.—

    (1) GENERAL RULE.—In the case of a taxpayer other than a corporation—

      (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and

      (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.

    (2) NONBUSINESS DEBT DEFINED.—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—

      (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

      (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

       *       *       *       *       *       *       *

  (f) GUARANTOR OF CERTAIN NONCORPORATE OBLIGATIONS.—A payment by the taxpayer (other than a corporation) in discharge of part or all of his obligation as a guarantor, endorser, or indemnitor of a noncorporate obligation the proceeds of which were used in the trade or business of the borrower shall be treated as a debt becoming worthless within such taxable year for purposes of this section (except that subsection (d) shall not apply), but only if the obligation of the borrower to the person to whom such payment was made was worthless (without regard to such guaranty, endorsement, or indemnity) at the time of such payment.

Section 1.166–1(c), Income Tax Regs. provides:

"Only a bona fide debt qualifies for purposes of section 166. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. * * *"

[3] The petitioner's testimony in this respect was in part as follows:

Q. Did you consider that the loan * * * was worthless at the time you made it?

A. No. I would have been better off if I had made the loan because they had bundled up for me, I think, 15,000 shares of Texas Toy and now it turned out that the Texas Toy finally went up two or three dollars a share. I don't know what happened thereafter, but I would have been better off by taking that stock.

The COURT. As collateral?

The WITNESS. As collateral for the note, but instead, I didn't make the loan to them. I refused to make the loan but took their check, and at that time their check was worthless. They were overdrawn at the bank at the time.

550

firm's check proved to be worthless and the petitioner paid the amount thereof to the bank.

The petitioner testified that he considered that the bank's loss was due to his negligence and that he felt he was under not only a moral, but also a legal, obligation to make reimbursement.[4]  However, if there was any legal liability on the part of the petitioner there is no evidence to show that the bank, the directors, the minority stockholders, or any one else had even suggested such or made any claim against the petitioner.  Under these circumstances, it seems to us that the payment must be considered as having been voluntarily made.

In order to be entitled to a deduction on account of a bad debt loss the petitioner must show that he became the owner of a valid debt which became worthless in the taxable year.  He has failed to show that he did become the owner of a valid bad debt.  He has not shown, and we fail to see, how he could be considered as in the position of a creditor.  In his negotiations with the brokerage firm he, as president of the bank, was acting on its behalf.  If as a result of the transaction described a debt was created at all, it was in favor of the bank and not in favor of the petitioner in his individual capacity. The business which an officer conducts for the corporation is not his own business.  A corporation and its stockholders are separate entities.  *Burnet* v. *Clark*, 287 U.S. 410, and *Dalton* v. *Bowers*, 287 U.S. 404.

Obviously the petitioner was not a guarantor, endorser, or indemnitor, within the meaning of section 166(f) of the Code, so as to entitle him to be treated as the owner of a debt.  Nor was there any actual assignment by the bank to him of any rights which the bank may have had as a creditor.  But even if it could be considered that upon his payment to the bank he acquired ownership of a debt owing from the brokerage firm, he still would not be entitled to a bad debt deduction.  Obviously any such debt would have been worthless when acquired by the petitioner and this would have been known to him. It is well established that if a debt was worthless when acquired such debt cannot be considered as having become worthless in his hands.

---

[4] His testimony was in part as follows:

The WITNESS. I paid Liberal State Bank.  This would have been a loss on the bank. They had carried this.  When it came back, carried it as a cash item until this few days later when I paid it off.  I felt like that, I knew it was due entirely to my negligence but it was never paid, would never have been entered.  I felt like not only a moral obligation but I felt there was a legal obligation on my part, that the bank could have a cause of action against me, even though I was president and controlling stockholder. it is not unlikely that the minority stockholders or other directors could have forced suit against me to pay it off.

The COURT. You say you think they could have?

The WITNESS. I think they could have.  I am alleging that this is a business bad debt loss and I have made efforts to collect it.  I have written the receivers and I was advised that they had no funds.

*Eckert* v. *Burnet*, 283 U.S. 140, and *Park* v. *Commissioner*, (C.A. 2) 58 F. 2d 965, affirming 22 B.T.A. 1263, certiorari denied 287 U.S. 645.

In *Putnam* v. *Commissioner*, 352 U.S. 82, the Supreme Court made it clear that, for tax purposes, a guarantor who acquires a debt pursuant to his contract of guaranty may be in an entirely different position from a taxpayer who voluntarily acquires a debt known by him to be worthless. The former is considered as acquiring a debt which becomes worthless in his hands, whereas the latter is treated as having acquired no valid debt at all.[5]

It follows that the petitioner is not entitled to any deduction on account of a bad debt for the taxable year 1958.

The petitioner has not pleaded, nor does he contend on brief, that he is entitled to a deduction under any other section of the Code. It may be observed, however, that since there has been no showing that the petitioner was under a legal obligation to make the payment which he made, there would be no grounds for considering the payment as an ordinary and necessary expense incurred in his business as an officer of the bank, within the intendment of section 162 of the Code (*Welch* v. *Helvering*, 290 U.S. 111, and *Sam P. Wallingford G. Corp.* v. *Commissioner*, (C.A. 10) 74 F. 2d 453, affirming a Memorandum Opinion of this Court), or as a loss incurred in carrying on such business, under section 165 of the Code (*Sam P. Wallingford G. Corp.* v. *Commissioner, supra*, and *Park* v. *Commissioner, supra*). Rather, the expenditure would seem to be an additional investment in the bank. *Park* v. *Commissioner, supra*.

We conclude that the petitioner has not shown that he is entitled to deduct the amount of $15,001.50.

*Decision will be entered under Rule 50.*

---

[5] In the *Putnam* case the Supreme Court stated in part:

It is said that the guarantor taxpayer who involuntarily acquires a worthless debt is in a position no different from the taxpayer who voluntarily acquires a debt known by him to be worthless. The latter is treated as having acquired no valid debt at all. [Citing in a footnote *Reading Co.* v. *Commissioner*, (C.A. 3) 132 F. 2d 306; *W. F. Young, Inc.* v. *Commissioner*, (C.A. 1) 120 F. 2d 159; *American Cigar Co.* v. *Commissioner*, (C.A. 2) 66 F. 2d 425]. The situations are not analogous or comparable. The taxpayer who voluntarily buys a debt with knowledge that he will not be paid is rightly considered not to have acquired a debt but to have made a gratuity. In contrast the guarantor pays the creditor in compliance with the obligation raised by the law from his contract of guaranty. * * *

> *       *       *       *       *       *       *

Under the doctrine of subrogation, payment by the guarantor, as we have seen, is treated not as creating a new debt and extinguishing the original debt, but as preserving the original debt and merely substituting the guarantor for the creditor. The reality of the situation is that the debt is an asset of full value in the creditor's hands because backed by the guaranty. The debtor is usually not able to reimburse the guarantor and in such cases that value is lost at the instant that the guarantor pays the creditor. But that this instant is also the instant when the guarantor acquires the debt cannot obscure the fact that the debt "becomes" worthless in his hands.