Sam Davis and Carolyn J. Davis v. Commissioner.
Davis v. Commissioner
Docket No. 4309-63.
United States Tax Court
T.C. Memo 1965-134; 1965 Tax Ct. Memo LEXIS 197; 24 T.C.M. (CCH) 723; T.C.M. (RIA) 65134; May 19, 1965
Sam Davis and Carolyn J. Davis, pro se. Jay B. Kelly, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1960 in the amount of $2,127.30. The issue for decision is whether petitioners are entitled to a deduction as an ordinary loss or as a business bad debt of amounts which one of petitioners had partially paid and partially given notes to pay on behalf of a corporation, the stock of which was owned by petitioners. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife residing in Chicago, Illinois, filed a joint income tax return for the calendar year 1960 with the district director of internal revenue at Chicago, Illinois. Sam *198 Davis (hereinafter referred to as petitioner) was president of Surburbia Motors, Inc. (hereinafter referred to as Suburbia), an Illinois corporation. Prior to January 7, 1960, petitioner had operated as a sole proprietorship a business of purchasing and selling antomobiles. On January 7, 1960, when Suburbia was incorporated, petitioner transferred the assets of his sole proprietorship, except for cash on hand and certain utility deposits, to Suburbia. Suburbia was organized to purchase, sell, trade, exchange, and deal in automobiles, motor vehicles, vehicles, and similar property. The opening journal entries on Suburbia's books showed assets consisting of transfer account $25, inventory of automobiles $12,810, prepaid rent of $850, and prepaid insurance of $405.09, totaling $14,090.09; and liabilities of the same amount consisting of an amount of $429.90 denominated "Daro Insurance Finance," an account payable to petitioner of $985.15, accrued taxes of $450.04, and an amount of $12,225 denominated "Floor Plan - Dobbs Investment Company." The capital stock account of Suburbia reflects that petitioners subscribed for all the capital stock and paid therefor the amount of $3,800, $500 *199 by cash and $3,300 by credits against advances made by petitioner. In addition to the advances made by petitioner to Suburbia which were credited in payment of Suburbia capital stock, petitioner made advances of funds which Suburbia used in its operation during the year 1960 in the amount of $1,766.90. Prior to the incorporation of Suburbia, petitioner, operating an automobile sales business individually, had had a so-called "floor plan" with Dobbs Investment Company (hereinafter referred to as Dobbs), which was in effect a line of credit whereby Dobbs would advance funds to petitioner to purchase used cars and would have a lien on the cars so purchased. When petitioner would make a sale of a car purchased under the "floor plan," Dobbs would release its lien on that particular car and be paid the amount advanced to purchase the car from the funds petitioner received in payment for the car. Petitioner would be billed monthly for the interest due Dobbs under the "floor plan." When Suburbia was formed, petitioner as president of that corporation, signed a new "floor plan" with Dobbs and Suburbia operated under its plan with Dobbs in substantially the same way petitioner had operated. *200 In July 1960 petitioner concluded that Suburbia would not be able to operate profitably. At that time Dobbs would not extend further credit for Suburbia to purchase an additional inventory of cars. It was therefore decided that Suburbia would cease business operations which it did on or about July 31, 1960. Under date of July 27, 1960, the vice president of Dobbs addressed a letter to Suburbia, the body of which is as follows: This is your authority to wholesale any and all cars that we now have floor planned for you, at the best possible price. The proceeds from the sale of these cars will be applied to the balance woing to us. Any shortages due us will be carried as an open accounts receivable without interest from the dates sold. After all cars are sold we agree to work out with you the balance owing us under mutual satisfactory terms. On August 31, 1960, petitioner executed a promissory note payable to Dobbs in the amount of $5,650 and was given the following memorandum signed by the vice president of Dobbs: To Whom It May Concern: It is hereby understood and agreed that in consideration of Sam Davis signing note for $5,650.00, payable on October 1st, 1960, the Dobbs *201 Investment Company does hereby agree that it will renew this note with Sam Davis on or before October 1st 1960, on a mutual satisfactory basis. On October 4, 1960, petitioner executed a renewal note in the amount of $5,450 to Dobbs secured by a chattel mortgage on all his household goods in or about his residence. A Federal corporate income tax return for the year 1960 was filed on behalf of Suburbia with the district director of internal revenue at Chicago, Illinois. The return showed a gross profit of $7,222.58, total deductions of $18,439.49, with a resulting loss of $11,216.90. Petitioners on their Federal income tax return for the year 1960 claimed a loss of $11,216.90 which they explained as "Suburia [Suburbia] Motors, Inc. - Cash advances - Corporation dissolved." Respondent in his notice of deficiency disallowed the ordinary loss of $11,216.90 claimed by petitioners but allowed a $1,000 net short-term loss with the following explanation: The ordinary loss of $11,216.90 claimed on your return as resulting from cash advances to Suburia [Suburbia] Motors, Inc., is disallowed. It is determined that such advances constitute: (1) a nonbusiness bad debt to the extent *202 of $7,416.90, and (2) investment in the capital stock of Suburia [Suburbia] Motors, Inc. to the extent of $3,800.00. Since both the nonbusiness bad debt and the shares of capital stock became worthless within the taxable year, you are allowed a short-term capital loss deduction of $1,000.00 under the provisions of section 1211 of the Internal Revenue Code of 1954. Petitioners now concede that of the amount of loss of $11,216.90 claimed by them, the amount of $3,800 represents an investment in capital stock of Suburbia and that they are limited to short-term capital loss treatment with respect to the worthlessness thereof. Opinion Petitioners apparently originally deducted the $11,216.90 on their joint income tax return under the belief that they were entitled to a deduction on their personal return for the loss sustained by Suburbia during the year 1960 on the theory that Suburbia was a small business corporation. At the trial petitioners stated that they were no longer making this contention, but were contending either that they were entitled to deduct $7,416.90 as a business loss or as a business bad debt. At the trial petitioner explained the making *203 of the advances to Suburbia with the statement, "I made advances to the company in hopes of pulling it out of the red as loans to take the money back later in hopes of the situation changing." Accepting this testimony that the advances in the amount of $1,766.90 were loaned by petitioner to Suburbia, and considering respondent's statement in the notice of deficiency to constitute a concession that these loans became worthless in 1960, the amount constitutes a nonbusiness bad debt. Whipple v. Commissioner, 373 U.S. 193 (1963). Petitioner makes no contention that he was in the business of financing corporations or of lending money. His view is that the corporate business was his business. It is well settled that the business of a corporation is not the business of its stockholders. Jan G. J. Boissevan, 17 T.C. 325, 331 (1951). Petitioner in his testimony stated that he personally was not a guarantor of the loans made by Dobbs to Suburbia under its floor plan. Petitioner explained his giving of the note to Dobbs as a combination of thinking he might be personally liable on Suburbia's debt and that his reputation and other business might be hurt if he let Suburbia *204 go into bankruptcy and did not pay its debts. [1]
If the note which petitioner gave to Dobbs is viewed as being in payment of some form of guarantee which petitioner as the sole stockholder of Suburbia had made of Suburbia's debt, Suburbia's obligation to Dobbs would by subrogation become a debt from Suburbia to petitioner which became worthless in 1960, so that petitioner sustained a loss from a nonbusiness bad debt in that year. Putnam v. Commissioner, 352 U.S. 82 (1956). *205 It is difficult from the evidence to ascertain the real reason why petitioner gave his notes to Dobbs. Apparently petitioner felt some moral obligation to pay Suburbia's debt to Dobbs. There is no evidence to show that there was any legal liability on the part of petitioner to pay Suburbia's debt to Dobbs. Under these circumstances it could be concluded that no debt was created from Suburbia to petitioner and therefore petitioner would not be entitled to a deduction for a bad debt of any nature. See Ralph E. Wilson, 40 T.C. 543, 550 (1963). The record is not persuasive that the note was given in connection with petitioner's business as distinguished from Suburbia's business. Therefore, the giving of the note cannot be considered either as payment of an ordinary or necessary expense in petitioner's business or as a business loss by petitioner for this reason, cf. Ralph E. Wilson, supra, as well as for the reason that petitioner apparently, being a cash basis taxpayer, would not necessarily be considered as having made any payment or suffered any loss by merely executing a note. See Helvering v. Price, 309 U.S. 409 (1940). We sustain respondent *206 in his treatment of the $7,416.90 as a nonbusiness bad debt of petitioner which became worthless in the year 1960. Decision will be entered for respondent. Footnotes
1. Petitioner testified as follows: * * * I sold the cars out on auction and took the loss and turned over a certain amount of money to them and I think a couple of months transpired after that before an agreement was reached that I signed, and this was when I signed this note. * * *
In previous years used cars and new car dealers were getting floor plans and going broke and going into bankruptcy and they were also condescending with large sums of money. Some court, and I not sure what court it was that held this decision, but some court held that the corporation was responsible for the money that was missing from the floor plan. With this thought in the back of my mind, plus the fact that I was in a position where they could have put my other business out because it was on a chattel mortgage, I had no alternative after Suburbia was closed. They were the sole possessors of every piece of equipment that I owned and operated my driving school under and this was the reason for the signing of the note rather than to go with bankruptcy because if I had gone into bankruptcy it would have cleared me of all the debts but it would have still hurt me as far as being a person is concerned and I would have to be put out of business and I could have been put out of business with one stroke. * * *
I had twenty automobiles through these people that they could have foreclosed on the automobiles and put me out of that business. THE COURT: Well, weren't you keeping up the payments? THE WITNESS: Yes, they were kept up * * *↩