ROBERT MADDEN and EDITH MADDEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Madden v. Commissioner
Docket No. 3947-78.
United States Tax Court
T.C. Memo 1980-350; 1980 Tax Ct. Memo LEXIS 233; 40 T.C.M. (CCH) 1103; T.C.M. (RIA) 80350; September 2, 1980, Filed *233 Petitioner, Dr. Madden, loaned money to a friend to meet the expenses of his two automobile dealerships, and later acquired controlling interest in both corporations. Madden continued to advance money to the two corporations, but both of them went out of business, one in 1970 and the other in 1976. Held, Madden's advances were contributions to the capital of the two corporations and his losses are not deductible as business losses, business bad debts or business expenses; held further, petitioners realized a capital gain on the sale of real estate in 1971; held further, additions to tax under sections 6651(a)(1) and (2), and section 6653(a), sustained. Henry Gelles, for the petitioners. Gerald A. Thorpe, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined the following deficiencies in, and additions to, the tax of petitioners for the taxable years 1971-1975: Year
Deficiency
1971
$12,766.24
1972
15,405.04
1973
9,395.54
1974
6,548.93
1975
13,812.04
Addition to tax under
Year
sec. 6651(a)(1) [1] *234 sec. 6651(a)(2)
sec. 6653(a)
1971
$2,995.71
$667.56
1972
3,851.26
804.02
1973
4,811.96
$1,477.84
962.39
1974
4,090.18
882.06
818.04
1975
3,213.77
78.98
803.44
Due to concessions by the parties, the issues to be decided are: (1) Whether amounts expended by petitioner Robert Madden with respect to corporations in which he had an interest gave rise to capital losses, or ordinary losses and business deductions; (2) whether gain or loss, and the character thereof, was realized upon the sale of a parcel of real property; and (3) whether petitioners are liable for additions to tax under sections 6651(a)(1), 6651(a)(2), and 6653(a). FINDINGS OF FACT Some of the facts were stipulated and they are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners Robert F. and Edith Madden (hereinafter petitioners), hasband and wife, resided in Lake Placid, N.Y., when they filed their petition in this case. For each of the calendar years 1971-1975, petitioners filed joint Federal income tax returns with the District Director, Albany, N.Y., on the following dates: Year
Date return filed
1971
Nov. 30, 1976
1972
Nov. 30, 1976
1973
Jan. 7, 1977
1974
Jan. 7, 1977
1975
Jan. 21, 1977
Dr. *235 Robert F. Madden (hereinafter Madden) is a practicing orthodontist in the Lake Placid, N.Y., area and has practiced dentistry or orthodontia in that area for approximately 25 years. During the taxable years in issue, petitioners' main source of income was Madden's orthodontia practice, although petitioners did have dividend and interest income of at least $13,000 in each year. During 1964 or 1965 Madden became friends with an individual named Gerald Wegman (hereinafter Wegman). Subsequently, but prior to 1968, Madden loaned money to Wegman, which Wegman repaid with interest. In 1968 Wegman sought financial assistance from Madden in starting a Chrysler-Plymouth automobile dealership in Lake Placid. At that time Wegman already operated AuSable Motor Sales, Inc. (hereinafter AuSable Motors), a Chrysler-Plymouth dealership in AuSable Fork, N.Y. Madden agreed to advance the necessary funds to Wegman. Wegman Motor Sales, Inc. (hereinafter Wegman Motors) was formed by Wegman in 1968 for the purpose of operating an automobile dealership in Lake Placid. In April 1968 Madden advanced $29,500 to Wegman for Wegman Motors. During 1968 Wegman Motors began operations on leased premises *236 in Lake Placid. At about the same time Madden also advanced $15,000 to Wegman for AuSable Motors. No formal loan agreements or other documents were ever executed by Madden and Wegman with respect to either of these advances. In 1969 Wegman asked Madden to advance money to him for his dairy business. Madden did so but, in order to secure both this and the prior advances, Madden requested and obtained controlling shares of both Wegman Motors and AuSable Motors as collateral. Although the shares were to be returned to Wegman if the advances were repaid, Madden held the shares in his own name. Shortly after Wegman trnasferred the shares to Madden, Wegman declared personal bankruptcy. After obtaining the corporate shares, Madden became an officer of both corporations and he became involved in the day-to-day activities of the two corporations, visiting the dealerships several times a week. Although each dealership employed a manger who was responsible for supervising the day-to-day activities of the business, Madden performed some of the managerial duties himself, such as ordering automobiles and parts, taking inventory, supervising the mechanics, and other supervisory tasks of a *237 general nature. Madden was also involved in discussions with representatives of the Chrysler Corporation. Upon Madden's recommendation, during 1969 Wegman Motors changed its name to Sara-Placid Chrysler-Plymouth, Inc. (hereinafter Sara-Placid). [2] Madden never received a salary from either Sara-Placid or AuSable Motors. In addition to the advances made by Madden to Wegman in 1968 in the total amount of $44,500, he also made additional advances to Sara-Placid and AuSable Motors. Between December 1968 and September 1970, these advances totaled $12,626.93 and $22,755, respectively. Furthermore, Madden also paid some of the expenses of these two corporations directly. Madden made these advances and paid these expenses so the corporations could stay in business and earn a profit. The leased premises upon which Sara-Placid began operations were inadequate and Madden was having difficulty negotiating a satisfactory lease. Accordingly, during 1969 Madden purchased a parcel of real property in Ray Brook, N.Y. (hereinafter Ray Brook property) upon which he built *238 a structure suitable for and automobile dealership. The construction of this building was completed by April 1970, at which time the building was occupied by Sara-Placid. There was no formal lease agreement between Madden and Sara-Placid, but Sara-Placid agreed to make the mortgage payments. In August 1970 Sara-Placid ceased doing business and in October 1970 it filed a petition in bankruptcy. Sara-Placid was adjudged a bankrupt in 1972. [3]
During the taxable year 1971, Madden sold the Ray Brook property for $75,000. The costs incurred in connection with the sale totaled $5,450.On their Federal income tax return for 1971, petitioners took a deduction for a loss on the sale of section 1231 property (Ray Brook) in the amount of $36,385.42. In determining the amount of the loss, petitioners used a basis of $113,358.03. Included within that figure were the following items: Payment to Marine Midland Bank ($11,411.71); payment to State Tax Commission ($9,020); payment for Sara-Placid's payroll ($23,996.74); and various payments for taxes, insurance expenses, and "loans" to Sara-Placid and AuSable Motors. In December 1972 Madden purchased for $990 the remaining 99 shares *239 of AuSable Motors from the bankruptcy estate of Wegman and his wife. AuSable Motors ceased doing business in 1976.
During 1972 Madden and another individual formed a corporation known as AuSable M&M, Inc. (hereinafter AuSable M&M).Madden owned 50 percent of the shares of AuSable M&M during the period 1972-75. After its formation AuSable M&M purchased a building which contained an automobile showroom. This showroom was then leased by AuSable Motors. Under the lease AuSable Motors made the mortgage payments on the property. The shareholders of Sara-Placid and AuSable Motors never made an election under section 1372 to be taxed as a small business corporation. During the taxable years 1971-75, petitioners paid expenses related to the operation of the three corporations in the following amounts, which amounts were included together with expenses of Madden's orthodontia practice in the business expenses deducted on the schedules C (Profit (or Loss) From Business or Profession) attached to the various tax returns: Taxable Year
Amount
1971
$ 16,813.33
1972
5,058.12
1973
3,219.13
1974
4,163.51
1975
1,519.78
Included within the amounts are various deductions for such items as: Depreciation; taxes; *240 vehicle expenses; interest; insurance; sales costs; legal and accounting expenses; salaries; and utility payments. The parties have stipulated that petitioners' schedule C expenses should be reduced for each of the above years in the amounts indicated. On their 1972 Federal income tax return, petitioners deducted $79,881.93 as a business loss. The loss was explained as follows: Business loss arising from the bankruptcy of the automobile business in which the taxpayers were engaged in the years 1968-1969-1970-1971-1972. The authority for the deduction arises factually from monies placed into and lost as a result of a business failure. This matter was the subject of a United States Tax Court case which treated the basic issue but only for the year 1969. A Decision of that Court affixed the tax for 1969 as the same amount that the Commissioners "Statutory Notice Statement" indicated and therefore the "Explanation of items" that gave rise to the additional tax do essentially set the character of the facts as regards tax treatment. Therefore a reading of all of the papers, including but not limited to the: Statutory Notice The Petition to the Tax Court The Answer to the Petition, *241 and The Decision made it clear that there has never been any issue over the business nature of the taxpayers' affairs, they were trade or business affairs. The only point in 1969 was whether the items in that year were deductible in 1969 or "chargeable" to an item to be capitalized and treated accordingly: such as either being depreciated or lost upon an event such as a Bankruptcy thereby giving rise to a business loss. Business Failure Bankruptcy Loss-- $79,881.93 [4]
The $79,881.93 amount was composed of the following items: Recipient
Date
Amount
Sara-Placid [5] *242 4-4-68
$12,000.00
AuSable Motors
4-9-68
15,000.00
Sara-Placid
4-9-68
17,500.00
AuSable Motors
12-31-68
12,000.00
AuSable Motors
5-5-69
6,000.00
AuSable Motors
7-8-69
3,000.00 [6]
Marine Midland
11-13-69
11,126.93
AuSable Motors
9-3-70
1,755.00
Sara-Placid
9-17-70
1,500.00
Total $79,881.93 The first three entries represent the advances made individually to Wegman in 1968.With the exception of the amount paid to Marine Midland, the remaining entries were identified as "loans" in Madden's ledger. The payment to Marine Midland was identified as being for Sara-Placid's floor plan. On their income tax returns for the taxable years 1973-1975, petitioners deducted as business losses the following amounts, which amounts were advanced by petitioners to AuSable Motors or were expended by petitioners for expenses related to the automobile business, and were explained on the returns as payments made as guarantors of the automobile business obligations: Taxable Year
Amount
1973
$17,248.00
1974
10,193.12
1975
28,689.31
These losses were in addition to the amounts included by petitioners in the business expense deductions claimed on the schedules C for the years in issue. The $17,248 amount deducted as a loss for 1973 was composed *243 of the following items: Payee
Date
Description [7]
Amount
Dept. of Tax &
2-13-73
Corp. tax-AuSable M&M
$ 125
Finance
Gordon Oil Co.
2-26-73
Heating unit for garage -
1,998
AuDable M&M
Corp. tax bureau
9-18-73
Corp. tax-AuSable M&M
125
AuSable Motors
9-19-73
Loan
15,000
Total
$17,248
The $10,193.12 amount deducted as a loss for 1974 was composed of the following items: Description
Amount
Corporation tax
$ 125.00
Mortgage payments to Saranac Lake Federal
C.U. for which Madden was not reimbursed
1,155.00
Mortgage payments to Olive R. Kinney
2,157.12
Northern Insuring Agency-insurance
1,756.00
AuSable Motors-loan
5,000.00
Total
$10,193.12
The $28,689.31 amount deducted as a loss for 1975 was composed of the following items: Description
Date
Amount
Monthly mortgage payment to Saranac
Lake Federal Credit Union of
$3,521 less reimbursement by AuSable
Motors of $2,040
$1,481.00
Northern Insuring Agency - insurance
1-23-75
656.00
Helen O'Brien, Tax Collector - town
taxes
1-23-75
1,427.31
AuSable Motors - loan
4-10-75
12,000.00
Corporation Tax Bureau - corporation
tax
9-18-75
125.00
AuSable Motors - loan
11-26-75
13,000.00
Total
$28,689.31
Petitioners' *244 returns for each of the taxable years in issue were prepared by an individual who is both a lawyer and a certified public accountant. This individual also prepared petitioners' return for 1970, which return was not signed until September 21, 1971. The return is stamped as having been received by the Internal Revenue Service on September 24, 1971. No extension of time in which to file the return was filed or granted. That return was not audited by the Internal Revenue Service. Madden knew that his Federal income tax return for each of the taxable years was due on the April 15th which immediately followed the close of the taxable year. Although Madden thought that his attorney had requested an extension for filing his 1971 return, extensions of time in which to file returns were not filed or granted for any of the taxable years in issue. An Internal Revenue Service representative contacted Madden in 1973 concerning the petitioners' delinquent income tax return for 1971. Madden was also contacted in April 1975 concerning petitioners' delinquent income tax returns for the taxable years 1971-1973. In the statutory notice of deficiency for the taxable years in issue, respondent determined *245 the following: (1) That the amounts relating to the automobile business included by petitioners in the business expense deductions claimed on the schedules C for the taxable years 1971-1975 were not deductible since they did not qualify as ordinary and necessary expenses of Madden's business; (2) that the business losses claimed for the taxable years 1972 and 1973-1975 were not losses sustained by Madden in his trade or business, but represented additional capital investment in Sara-Placid, AuSable Motors, and AuSable M&M; (3) that in 1971 petitioners realized a capital gain of $20,053.03 on the sale of the Ray Brook property rather than the claimed $36,385.42 loss; (4) that petitioners had incurred capital losses in 1970 and 1971 (reduced by the gain determined on the sale of the Ray Brook property) as a result of advances made to and expenditures made for Sara-Placid, which losses were deductible in those years to the extent allowable under sections 165 and 1211, with the remainder being carried forward to the taxable years 1972-1975 and deductible during those years to the extent allowable; and (5) that petitioners were liable for the section 6651(a)(1) and (a)(2) and the section *246 6653(a) additions to tax. On brief, respondent conceded that petitioners realized only a $11,655.21 capital gain on the sale of the Ray Brook property. OPINION Business Deductions and Losses
Dr. Madden was a successful dentist - orthodontist in Lake Placid, N.Y. during the years in issue and had been for about 25 years. In 1968 he loaned Wegman, a friend of his, $44,500 to open a new automobile dealership in Lake Placid and to provide working capital for Wegman's existing automoile dealership in AuSable Fork, N.Y. The loans were on an informal basis, no record being made thereof and there were no agreements as to repayment dates or payment of interest. Madden loaned Wegman additional money in 1969 to operate his diary business and Madden requested and received stock certificates representing a majority interest in both automobile businesses, which were operated in corporate form, as collateral for all three loans. Wegman went into personal bankruptcy later in 1969 and Madden apparently took over the owner's responsibilities for running the two automobile businesses. Both corporations needed additional cash to stay in business and Madden made advances to them, either directly *247 or by paying their bills, to keep them in business. The Lake Placid business failed in August of 1970; the AuSable business continued in business until 1976. Madden eventually acquired all the outstanding stock of both corporations. Unfortunately, Madden accounted for his expenditures for the automobile businesses in the same manner that he accounted for expenditures for his dental practice and it is difficult to determine from his records which was which. However, it appears that the parties by stipulation have separated the expenditures as between the automobile businesses and the dental business. Furthermore, Madden made no distinction in his records with respect to whether an expenditure for the automobile business was a capital expenditure or for operating purposes; and the records of the two corporations apparently did not reflect whether any expenditures by Madden for their businesses were loans, contributions to capital, or what. [8] *248 On their income tax returns petitioners claimed most, if not all, of the expenditures made by Madden to, or in behalf of, or for the benefit of, the automobile businesses as personal business expenses or ordinary losses. The principal issues for decision arose as a result of Madden's involvement with the three corporations, the two dealerships and a realty company, which were connected with the operation of the automobile dealerships. Petitioners offered no explanation and no pattern exists as to why some amounts were deducted by petitioners as section 162(a) expenses and some as business losses. [9] Both catagories of deductions were for amounts advanced to or expended on behalf of Sara-Placid, AuSable Motors, and AuSable M&M. Respondent disallowed the claimed deductions and losses on the ground that expenses and losses were not incurred by Madden in his trade or business. Respondent determined the amounts expended with regard to Sara-Placid to be capital contributions for which capital loss deductions and carry forwards were allowed beginning in 1970, the *249 year Sara-Placid ceased doing business. On brief, respondent states that similar deductions were allowed for amounts expended with regard to AuSable Motors beginning in 1976, the year that corporation ceased doing business. The determinations made by respondent are presumed correct and petitioners have the burden of proving them wrong. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioners have failed in their burden. For convenience we begin with a discussion of petitioners' "business" losses." Petitioners claimed business losses for each of the years 1972-1975. As set out in our findings, these "losses" consisted of amounts advanced to or on behalf of Sara-Placid, AuSable Motors, or AuSable M&M. On brief, petitioners argue that the claimed deductions are allowable under either section 165 as a loss incurred in Madden's trade or business or under section 166 as a business bad debt. We conclude that neither contention supports the deductions taken. Section 165(a) authorizes a deduction for any loss sustained during the taxable year for which compensation is not otherwise received. [10] *251 In the case of individuals, section *250 165(c)(1) limits the allowable deduction, interalia, to those incurred in a taxpayer's trade or business. Even if any "losses" were incurred when Madden made the various payments and advances, such losses would not be deductible under the provisions allowing a deduction for losses incurred in a trade or business since Madden was not in the automobile trade or business. [11] As noted above, Madden owned stock in three corporations engaged in the automobile business or related thereto, and Madden became very much involved in the operation of those businesses. However, it was those corporations which were involved in the automobile business, not Madden, and their corporate existence cannot be ignored. Whipple v. Commissioner, 373 U.S. 193 (1963). Madden was a shareholder and corporate officer of those corporations."The business which an officer conducts for the corporation is not his own." Wilson v. Commissioner, 40 T.C. 543, 550 (1963). *252 The losses deducted were not incurred in Madden's trade or business. Thus, the claimed deductions cannot be classified as section 165 trade or business losses. [12]
Section 166 [13] *254 provides as a general rule that a deduction shall be allowed for any "bona-fide" debt which *253 becomes worthless within the taxable year. "A bona-fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. A gift or contribution to capital shall not be considered a debt for purposes of section 166." Sec. 1.166-1(c), Income Tax Regs. Petitioners have the burden of establishing that the various payments were loans rather than capital contributions. Gilbert v. Commissioner, 262 F.2d 512, 513 (2d Cir. 1959), cert. denied 359 U.S. 1002 (1959); Trans-Atlantic Co. v. Commissioner, 469 F.2d 1189, 1191 (3d Cir. 1972), affg. a Memorandum Opinion of this Court.
In resolving questions of debt versus equity, courts *255 have identified and considered various factors. See, e.g., Gilbert v. Commissioner, supra; Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972) (13 factors); Fin Hay Realty Co. v. United States, 398 F.2d 694 (3d Cir. 1968) (16 factors); Georgia-Pacific Corp. v. Commissioner, 63 T.C. 790 (1975) (13 factors). [14] No one factor is determinative, John Kelley Co. v. Commissioner, 326 U.S. 521, 530 (1946), rather, the conclusion must be made in light of all the facts of the case. Gilbert v. Commissioner, supra at 514. The various factors are only aids in answering the basic question whether, as a matter of substantial economic reality, the payments represented valid indebtedness or risk capital. Having considered the circumstances of Madden's payment of the various expenses and advances in light of the factors set forth in the above-cited cases, we can only conclude that the various expenditures were capital contributions rather than loans. The initial advances at issue were those made as personal loans to Wegman in 1968 which were used by Wegman in connection with Sara-Placid and AuSable Motors. *256 These advances clearly cannot be considered as of that time as capital contributions by Madden to the two corporations. This, however, does not end the matter because in 1969 the nature of Madden's advances changed. Following Wegman's request in 1969 for additional funds for use in an unrelated business, Madden requested and obtained controlling shares of both Sara-Placid and AuSable Motors. Although these shares may have been held only as collateral and would have been returned to Wegman had he repaid the initial advances, the shares were held by Madden in his own name. Shortly thereafter Wegman took personal bankruptcy and from that point forward Madden was involved in day-to-day operations of the two corporations. Given these latter facts and other evidence in the record concerning Madden's dealings with the two corporations, we cannot say that he held these shares only as security for the previous advances to Wegman. Certainly, petitioners have not established that to be the case. In fact, in justifying a loss taken for these amounts in 1972, petitioners cite the business failure of the corporations, not that any "loans" to Wegman became worthless. Regardless of the initial *257 nature of the advances to Wegman, we are convinced that in 1969 Madden acquired an equity interest in Sara-Placid and AuSable Motors. We believe the same character must be accorded those subsequent advances and payments made by Madden, including those to or for AuSable M&M. Although Madden only owned 50 percent of the stock of AuSable M&M, the record presented is no more convincing with regard to expenditures for that corporation than it is for expenditures made in connection with Sara-Placid and AuSable Motors. Moreover, the record is not such that it can be stated with any certainty which expenditures were made for which corporations. The circumstances of this case clearly indicate that the various expenditures made did not create bona-fide debts. Rather, these were investments in the corporations which were at risk and any repayment depended upon the success of the corporations. [15] Interest was never paid on any advance. In fact, no interest rate was ever specifically set forth, nor were any promissory notes given, maturity dates fixed, or repayment schedules established. Thus, it has not been established that a "strict debtor-creditor relationship" was created. See Fin Hay RealtyCo. v. United States, supra at 697; *258 Litton Business Systems,Inc. v. Commissioner, 61 T.C. 367, 377 (1973). In summary, after considering the evidence in light of those factors generally utilized, we can only conclude that the various expenditures were in the nature of capital contributions since they were clearly at the risk of the businesses. Since it appears that respondent allowed capital loss deductions with regard to Sara-Placid and AuSable Motors beginning in the taxable years in which those corporations ceased doing business and in which any capital contributions arguably became losses, petitioners would not appear to be entitled to any greater loss deduction for any taxable year before the Court. [16] As to AuSable M&M, there is no evidence that any equity interest therein has become a "loss." The record hints that this corporation was still in existence and operating as of the date of trial of this case in 1979. Accordingly, respondent's determinations *259 concerning the "business losses" deducted by petitioners are sustained. The next question which needs to be addressed is whether petitioners are entitled to deduct under section 162(a) amounts paid for various expenses of the corporations. As we point out above, the trade or business of a shareholder is not the same as that of the corporation in which he owns stock. Generally a shareholder, even a majority or sole shareholder, may not deduct a payment made on behalf of a corporation since such expenses are considered as ordinary and necessary expenses of the corporation but not of the shareholder for purposes of section 162(a). Deputy v. DuPont, 308 U.S. 488 (1940); Rink v. Commissioner, 51 T.C. 746, 751 (1969); Koree v. Commissioner, 40 T.C. 961, 965-66 (1963). Exceptions to such rule exist, however, and the payment may be deductible if it can be shown that the payment is also an ordinary and necessary expense of a trade or business of the shareholder. Lohrke v. Commissioner, 48 T.C. 679 (1967); Gould v. Commissioner, 64 T.C. 132, 135 (1975). *260 In attempting to invoke this exception, petitioner states "Although the taxpayer paid corporate obligations, payments made to protect one's business reputation and to enable the taxpayer to carry on his trade or business have been allowed as deductions." [17]
To determine whether petitioners are entitled to deductions for the corporate expenses paid, the purpose or motive for making the payment must be ascertained. Lohrke v. Commissioner, supra at 688; Gould v. Commissioner, supra. It is clear from the record in the instant case that Madden made the payments in order to keep the various corporations in existence in the hope that a return on his expenditures could be realized through future corporate profits. While such expenditures may incidentally have maintained his "business" and his business reputation, such was not their primary purpose. Payments of corporate expenses in order to protect one's interest in that corporation cannot be deducted under section 162(a). Dodd v. Commissioner,298 F.2d 570, 576-77 (4th Cir. 1962), affg. a Memorandum Opinion of this Court; Koree v. Commissioner,supra; *261 Rand v. Commissioner,35 T.C. 956 (1961); Ihrig v. Commissioner,26 T.C. 73, 76 (1956). The expenses paid were those of the corporations, taxable entities separate from petitioners. Accordingly, the payments cannot be deducted under section 162. [18]
In view of the above conclusion, the expenditures must be treated as either loans or capital contributions. Koree v. Commissioner,supra. Respondent determined that the expenditures were capital contributions, the same characterization as for the amounts deducted as business losses. Under the facts of this case, we see no reason for distinguishing between the amounts deducted under section 162(a) and those deducted as business losses. All of these amounts, whether paid to a third-party creditor of a corporation or advanced directly to a corporation, were at "risk" and in the nature of capital contributions. *262 Accordingly, we sustain respondent's determination.[19]
Ray Brook Property
The next issue for decision is whether a gain or loss was realized, and the character thereof, on the sale of the Ray Brook property. The question of gain or loss on the sale is essentially one of the adjusted basis in the property, the parties agreeing that the gross amount realized on the sale was $75,000. Respondent determined in the notice of deficiency that Madden had a basis in the property of $49,496.98 and a gain of $20,053.02. On brief respondent concedes that Madden had an adjusted basis of $57,994.79 in the property, thereby reducing the gain to $11,665.21. Petitioners assert that the proper basis was $113,358.03, thereby giving rise to a loss of $35,385.42. [20] *263 Sections 1011 and 1012 [21] *264 provide the general rule that the adjusted basis for determining gain or loss from the sale of property shall be the cost of the property. Cost is the amount paid for the property. Sec. 1.1012-1(a), Income Tax Regs.
Petitioners have the burden of establishing that Madden had an adjusted basis in the property greater than that determined (and conceded) by respondent. Rule 142(a), Tax Court Rules of Practice and Procedure; Hill v. Commissioner,63 T.C. 225 (1974).At trial petitioners introduced into evidence three documents to support the claimed adjusted basis of $113,385. These documents do not satisfy petitioners' burden. The first document is the "Statement of Sale" for the Ray Brook property. Computed thereon is a balance due Madden of $26,874.74 from the sale of the property after the payment of mortgages and other items. This $26,874.74 *265 amount was included in the adjusted basis of the property. Notations on this document indicate that part ($11,411.71) of this amount was remitted to the Marine Midland Bank and part ($9,020) was remitted to the State Tax Commission. Petitioners never established what these amounts represented, much less that they were properly includable in the adjusted basis. From the limited evidence presented, the only conclusion possible is that these amounts were paid in connection with the operation of Sara-Placid.As such they were not part of the cost of the property. The second document is a chronological list of disbursements made by Madden from March 1969 to October 1970 with respect to the Ray Brook property, totalling $75,946.56. Included on this list are items for the new construction on the Ray Brook property, items which are properly includable in the adjusted basis.Also included, however, are items which, from the description provided, are not clearly includable. These items (computed by respondent to total $31,723.36) include amounts for: Sara-Placid's payroll ($23,996.74); various taxes; insurance expenses; and "loans" to Sara-Placid and AuSable Motors. Petitioners have provided *266 no evidence to justify the inclusion of those various items in the adjusted basis. Accordingly, we sustain respondent's determination, as conceded on brief, that Madden had an adjusted basis of $57,884.79 in the Ray Brook property and, after reduction of the gross amount realized from the sale by selling expenses of $5,450, that a gain of $11,665.21 was realized. Having concluded that a gain was realized from the sale of the Ray Brook property, the character of that gain cannot be subject to dispute. Regardless of whether the Ray Brook property was section 1231 property, the section utilized by petitioners to deduct as an "ordinary" loss the claimed loss from the sale of the Ray Brook property, any gain will be taxed as a capital gain. Secs. 1211, 1212, 1221, 1231(a). Additions to Tax
In the notice of deficiency respondent determined section 6651(a)(1) and section 6653(a) additions to tax for each of the taxable years in issue and section 6651(a)(1) additions to tax for the taxable years 1973, 1974, and 1975. Section 6651(a)(1) [22] *268 generally provides that if a taxpayer fails to file a return on or before the date it is due, he is liable for an addition to tax unless such failure *267 is "due to reasonable cause and not due to willful neglect." The returns for each of the taxable years in issue, which returns would normally be due on or before the April 15th following the end of the taxable year, were filed on the following dates: Taxable Year
Date return filed
1971
Nov. 30, 1976
1972
Nov. 30, 1976
1973
Jan. 1, 1977
1974
Jan. 1, 1977
1975
Jan. 21, 1977
Treasury Regulations define "reasonable cause" for purposes of section 6651(a)(1) as encompassing those circumstances when a taxpayer is unable to file a return when due, notwithstanding the exercise of ordinary business care and prudence.Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.; Inter-American Life Insurance Co. v. Commissioner,56 T.C. 497, 511 (1971), affd. per curiam 469 F.2d 697 (9th Cir. 1972). Petitioners bear the burden of establishing reasonable cause. Bebb v. Commissioner,36 T.C. 170, 173 (1961). Although petitioners make no specific mention on brief as to why they are not liable for the section 6651(a)(1) additions to tax, the evidence presented by petitioners suggests the argument that reliance on a tax advisor to prepare their returns establishes the necessary reasonable cause. This argument is unpersuasive under the circumstances. The tax advisor retained by petitioners set forth in an affidavit accepted into evidence three factors which assumedly argue against imposition of the additions: (1) Requests for extensions of time for filing returns *269 were submitted for the taxable years 1971-1973; (2) he had responsibility to file timely the returns for 1971-1973; and (3) existence of a controversy, which was resolved in 1975, with respect to petitioners' taxable year 1969, purportedly concerning the same issues as involved in the taxable years herein, somehow made the timely filing of returns difficult. None of these factors preclude imposition of the additions to tax. Had extensions of time for filing returns been obtained, the section 6651(a)(1) additions to tax would not have been imposed for any extension period. Herein, not only is there no evidence that any extensions were ever granted, the only evidence we have that the extensions were ever requested was the tax advisor's statement. No documentary evidence was introduced to support this statement and, on brief, respondent claims he has no record of any requests. Moreover, it is stated that requests were only made for the taxable years 1971-1973. There is no evidence as to the years 1974 and 1975. Based on this record we can only conclude that the returns were due on the normal date, the April 15th following the end of the taxable year. Madden knew that returns were *270 required and when those returns were due. Under such circumstances, reliance on a tax advisor to prepare and file those returns is not sufficient to establish reasonable cause. Logan Lumber Co. v. Commissioner,365 F.2d 846 (5th Cir. 1966), affg. a Memorandum Opinion of this Court; Estate of Frank Duttenhofer v. Commissioner,49 T.C. 200 (1967), affd. per curiam 410 F.2d 302 (6th Cir. 1969); Estate of William T. Mayer v. Commissioner,43 T.C. 403 (1964), affd. per curiam 351 F.2d 617 (2d Cir. 1965). Cf. Haywood Lumber & Mining Co. v. Commissioner,178 F.2d 769 (2d Cir. 1950), revg. 12 T.C. 735 (1949). The returns for 1971 and 1972 were filed 5-1/2 years and 4-1/2 years late, respectively. The returns for the remaining 3 taxable years were late for lesser periods of time. Given Madden's knowledge that returns were due and when they were due, mere reliance on a tax advisor to prepare the returns does not excuse such lengthy delays. Furthermore, Madden's belief that a request for an extension of time in which to file had been obtained for 1971 has no effect. There was no evidence that Madden ever attempted to learn when or for how long the extension had been granted. It was not *271 reasonable for him to believe it was indefinite. Moreover, there was no testimony that he believed similar extensions had been requested for years subsequent to 1971. In addition to the general insufficiency of petitioners' reliance on a tax advisor as establishing the necessary reasonable cause, there are facts in this case which should have led Madden to question reliance on this tax advisor. First of all, the tax return for petitioners' 1970 taxable year was prepared late. Certainly this should have alerted petitioners. Secondly, during both 1973 and 1975 Madden was contacted by Internal Revenue Service personnel concerning delinquent income tax returns. Notwithstanding these contacts, considerable time still elapsed before returns were filed. Moreover, having been contacted concerning delinquent returns for earlier taxable years, Madden should have exercised care to see that returns due for later years were timely filed. The last apparent argument in opposition to the imposition of the additions is the contention that a dispute concerning petitioners' 1969 taxable year somehow excuses the filing of returns for the taxable years in issue until resolution of that dispute. *272 Even assuming that the same issues involved with regard to petitioners' 1969 year are involved herein (as assumption more than generous to petitioners' argument), the existence of a dispute for an earlier year does not justify the failure to file timely returns for later years. Golwinski v. Commissioner,25 T.C. 934 (1956), affd. 243 F.2d 635 (D.C. Cir. 1957); Knollwood Memorial Gardens v. Commissioner,46 T.C. 764, 796 (1966); Estate of Duttenhofer v. Commissioner,supra at 206. In summary, we conclude that petitioners have not established the requisite reasonable cause for their failure to file timely the returns for the taxable years in issue. Accordingly, petitioners are liable for the section 6651(a)(1) additions to tax determined by respondent. Section 6651(a)(2) [23] *273 provides for an addition to tax if a taxpayer fails to pay on or before the date prescribed the tax shown on a return, unless such failure is "due to reasonable cause and not due to willful neglect." The required reasonable cause is the same as that for section 6651(a)(1), "the exercise of ordinary business care and prudence." Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Petitioners make no specific arguments as to why they should not be held liable for section 6651(a)(2) additions to tax for the years 1973-1975. If their reasons are the same as those considered with regard to the section 6651(a)(1) additions, we believe they have been sufficiently considered and rejected. Accordingly, we hold that petitioners are liable for the section 6651(a)(2) additions to tax. [24] *274 Section 6653 (a) [25] provides for an addition to tax if any part of any underpayment of tax is due to "negligence or intentional disregard of rules and regulations." As was the situation with the section 6651(a)(1) and (2) additions to tax, petitioners' bear the burden of showing that the respondent's determination was erroneous. Bixby v. Commissioner,58 T.C. 757, 791 (1972). While it may seem harsh to assert penalties under both section 6651(a)(1) *275 for failure to file and under 6653(a) for failure to pay, when both failures result from failure to file, the additions imposed by section 6653(a) may be imposed even if the only "negligence" was the failure to file timely returns for which section 6651(a)(1) additions are also imposed. Robinson's Dairy, Inc. v. Commissioner,35 T.C. 601, 608-609 (1961), affd. 302 F.2d 42 (10th Cir. 1962). Despite our reluctance to sustain the double penalty, petitioners have failed to carry their burden of proving that respondent's determination that petitioners' negligence was the cause of the underpayments was in error, so respondent's determination must stand.Accordingly, the section 6653(a) additions to tax are sustained. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue, unless otherwise indicated.
2. Hereinafter, for convenience "Sara-Placid" is used to describe this automobile dealership before and after the name change.↩
3. As stipulated.↩
4. For petitioners' taxable year 1969 respondent issued a statutory notice of deficiency on April 26, 1972.A petition for redetermination of the deficiency determined for 1969 was filed in this Court. In answering that petition, respondent admitted "that petitioners in the year 1969 were engaged in the automobile business." A stipulated decision was entered for the year 1969 by this Court on April 23, 1975, pursuant to an agreement by the parties, in which it was decided that a deficiency in tax existed in the amount set forth in the statutory notice.↩
5. For convenience, payments made to either Wegman Motors or Sara-Placid are listed as being made to Sara-Placid. 6. The actual payment to AuSable Motors on July 8, 1969, was $6,000. Because $3,000 was repaid on August 28, 1969, only the outstanding balance is listed.↩
7. The descriptions of the various payments are taken from Madden's ledgers. Madden's records were kept by an individual who also acted as his dental assistant.↩
8. No corporate records were offered in evidence.
9. Due to the state of the record, we cannot identify with certainty which expenditures were made for which corporation. We recognize that Sara-Placid ceased doing business prior to the first taxable year in issue. Because of the result we reach, however, it is not crucial that the expenditures be specifically identified.↩
10. Sec. 165 provides in pertinent part: (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (b) Amount of Deduction.--For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100. For purposes of the $100 limitation of the preceding sentence, a husband and wife making a joint return under section 6013 for the taxable year in which the loss is allowed as a deduction shall be treated as one individual. No loss described in this paragraph shall be allowed if, at the time of filing the return, such loss has been claimed for estate tax purposes in the estate tax return.
11. As set forth in our findings, respondent admitted in his answer in a Tax Court proceeding involving petitioners' 1969 taxable year "that petitioners in that year were engaged in the automobile business." This admission in no way precludes respondent from denying that petitioners were in the automobile business during the years in issue herein.It is a general principle that each taxable year is separate and different years can have different facts. Moreover, even if the facts were the same respondent would not be estopped since estoppel only applies to those matters which were actually presented and determined in the first suit. See Commissioner v. Sunnen, 333 U.S. 591, 598-99↩ (1948). The decision in the 1969 case was entered pursuant to a stipulation of the parties. 12. Petitioners do not claim that the losses were incurred in transactions entered into for profit. See Putnam v. Commissioner, 352 U.S. 82↩ (1956).
13. (a) General Rule.-- (1) Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts.--When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. (b) Amount of Deduction.--For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (c) Reserve for Bad Debts.--In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary) a deduction for a reasonable addition to a reserve for bad debts.
(d) Nonbusiness Debts.-- (1) General Rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. (e) Worthless Securities.--This section shall not apply to a debt which is evidenced by a security as defined in section 165(g)(2)(C).↩
14. See also Dixie Dairies Corp. v. Commissioner↩, 74 T.C.     (May 29, 1980).
15. Even if these advances gave rise to debts, there is no evidence that such debts became worthless in the years before us. AuSable Motors and AuSable M&M were still in business at the end of 1975 and both Wegman and Sara-Placid had gone into bankruptcy before 1971.↩
16. Petitioners made no argument that any capital losses incurred with regard to Sara-Placid were deductible beginning in 1972, the year that corporation was adjudged a bankrupt.↩
17. Petitioners cited Conti v. Commissioner, T.C. Memo. 1972-89↩, as support for their statement.
18. Petitioners did not assert that they were entitled to the claimed deductions on the grounds that the corporation entities should be disregarded or that a valid subchapter S election had been made.Nor is there any contention that the payments were made to protect Madden's status as an employee. Accordingly, we need not address these points.↩
19. Petitioners argue on brief that Madden was a guarantor of the corporations' obligations. There is no evidence in the record to support this argument. Furthermore, Madden's losses were not proximately related to his trade or business. See Whipple v. Commissioner,373 U.S. 193 (1963); United States v. Generes,405 U.S. 93↩ (1972).
20. Other adjustments which are not in issue cause the disparity between the respective amounts claimed by the parties to have been realized upon the sale and the amounts which would result by subtracting from the agreed upon gross amount realized the respective bases claimed by the parties.
21. SEC. 1011. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. (a) General Rule.--The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis (determined under section 1012 or other applicable sections of this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses)), adjusted as provided in section 1016. (b) Bargain Sale to a Charitable Organization.--If a deduction is allowable under section 170 (relating to charitable contributions) by reason of a sale, then the adjusted basis for determining the gain from such sale shall be that portion of the adjusted basis which bears the same ratio to the adjusted basis as the amount realized bears to the fair market value of the property. SEC 1012.BASIS OF PROPERTY--COST. The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses). The cost of real property shall not include any amount in respect of real property taxes which are treated under section 164(d) as imposed on the taxpayer.↩
22. Sec. 6651(a)(1) provides: (a) Addition to the Tax.--In case of failure-- (1) to file any return required under authority of subchapter A of chapter 61 (other than part III thereof), subchapter A of chapter 51 (relating to distilled spirits, wines, and beer), or of subchapter A of chapter 52 (relating to tobacco, cigars, cigarettes, and cigarette papers and tubes), or of subchapter A of chapter 53 (relating to machine guns and certain other firearms), on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate.
23. Sec. 6651(a)(2) provides: (a) Addition to the Tax.--In case of failure--* * * (2) to pay the amount shown as tax on any return specified in paragraph (1) on or before the date prescribed for payment of such tax (determined with regard to any extension of time for payment), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount shown as tax on such return 0.5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 0.5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate; * * *.↩
24. While petitioners do not raise the issue, as we read section 6651(c)(1)(A), the amount of the addition to tax under paragraph (1) of subsection (a) should be reduced by the amount of the addition under paragraph (2) of subsection (a) for any month to which an addition to tax applies under both paragraphs (1) and (2). If this has not been done, we would expect it to be done in the Rule 155 computations.
25. Sec. 6653. Failure to Pay Tax. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes.--If any part of any underpayment (as defined in subsection (c)(1) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩